# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO: 24-48** |
| **ISIAH KANGAR** | : | |

## ORDER

AND NOW, this ____ day of _____ 2024, upon consideration of the Government's Motion *in Limine* to admit certain evidence under Federal Rule of Evidence 404(b), and any response thereto, it is hereby ORDERED that the Motion is GRANTED.

BY THE COURT:

_____
HONORABLE MARK A. KEARNEY
United States District Court Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     CRIMINAL NO: 24-48 |
| ISIAH KANGAR | : |

## GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT EVIDENCE OF PRIOR BAD ACTS PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)

The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, Kelly Harrell, Assistant United States Attorney for the District, and Chelsea Schinnour, Trial Attorney, U.S. Department of Justice, Human Rights and Special Prosecutions Section, hereby files its Motion *in Limine* to Admit Evidence of Other Bad Acts under Federal Rule of Evidence 404(b).

WHEREFORE, for the reasons stated in the accompanying Memorandum of Law, which is incorporated here by reference, the United States of America respectfully requests that the Government's Motion be granted and the Court enter an Order that the evidence at issue may be admitted at trial pursuant to appropriate limiting instructions.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

CHELSEA SCHINNOUR
Trial Attorney
U.S. Department of Justice
Human Rights and Special Prosecutions Section

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-48 |
| ISIAH KANGAR | : | |

**MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S
MOTION *IN LIMINE* TO ADMIT EVIDENCE OF OTHER BAD ACTS
PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)**

  The United States of America, by its undersigned attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, Kelly Harrell, Assistant United States Attorney for the District, and Chelsea Schinnour, Trial Attorney, U.S. Department of Justice, Human Rights and Special Prosecutions Section, seeks a pre-trial ruling that it may admit in its case-in-chief evidence of the defendant's involvement in Charles Taylor's government forces in Liberia, which resulted in the defendant's exclusion from South Africa after he self-reported this information and used his true name of Isiah Kangar in an application for asylum status there in 2006. The government submits that this evidence is admissible under Federal Rule of Evidence 404(b) to show the defendant's motive to commit the crimes with which he is charged in the Indictment.[1]

---

[1] In compliance with the Court's order issued on June 21, 2024, the undersigned AUSA conferred with counsel for the defendant to determine the defendant's position on this motion. The defendant opposes the government's motion to introduce this evidence under Rule 404(b) based on the argument that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant.

1

I.  **BACKGROUND**

   A.  **Facts Giving Rise to the Charged Offenses**

On February 7, 2024, Isiah Kangar was indicted by a federal grand jury and charged with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count One), fraud, misuse of visa, permits, and other documents in violation of 18 U.S.C. § 1546(a) (Count Two), unlawful procurement of citizenship or naturalization, in violation of 18 U.S.C. § 1425(a) (Count Three), and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Four).  These charges arise from the defendant, a native and citizen of Liberia, assuming the identity of his younger brother, Peter Kangar, to obtain an immigrant visa and gain entry to the United States in 2010, his years of living under his brother's identity in the United States, and his attempt to procure U.S. citizenship using his brother's identity in 2022.

The defendant traveled from Liberia to South Africa sometime after Charles Taylor was elected president of Liberia in 1997.  Taylor was the leader of the National Patriotic Front of Liberia (NPFL), a rebel group that sought to violently overthrow the government of Liberia during the country's first civil war beginning in 1989 and simultaneously terrorized the civilian population of the country until taking power with Taylor's election as president of Liberia in 1997.

In 2006, the defendant sought asylum in South Africa.  In response to a MLAT request, the government received information pertaining to the defendant from South Africa (the South Africa record), including his 2006 asylum application in his true name, Isiah Kangar.  In the application, the defendant listed his spouse as Taslima Kangar, and his three children by name.  Moreover, he submitted a fingerprint card in support of his application, which the government also received from South Africa.  In 2018, a latent fingerprint examiner with the U.S.

Department of Homeland Security (DHS) compared the 2006 South Africa fingerprints for Isiah Kangar to the fingerprints held by DHS for "Peter Kangar," who immigrated to the United States. in 2010, and found they were a match.

The defendant, Isiah Kangar, was denied asylum in South Africa due to his involvement with Charles Taylor's forces, as further discussed below. After being denied immigration benefits in South Africa using his true identity, the defendant returned to Liberia and, in approximately 2009, he began his scheme to defraud the United States by assuming his younger brother's identity to apply for a U.S. immigrant visa as an unmarried adult child of a lawful permanent resident of the United States. (his mother, who lived in Maryland). On August 11, 2009, the defendant signed Form DS-230 (Department of State Application for Immigrant Visa and Alien Registration) in the name of his younger brother, "Peter Kangar." Among other statements in his DS-230, the defendant falsely represented that he had never used any other names or aliases; he was born in January 1981; he was 28 years old; he was single (never married); he did not have a spouse; he had no children; and he had lived in Liberia from 1981 to present. The defendant also provided a birth certificate in the name of Peter Kangar.

Prior to this, on June 18, 2009, at the behest of Kangar's mother, Liberian national and naturalized U.S. citizen, A.B., signed U.S. Citizenship and Immigration Services ("USCIS") Form I-864 ("Affidavit of Support") as the substitute sponsor for "Peter Kangar's" immigration to the United States By signing this form, A.B. agreed to provide financial support to "Peter Kangar" in the United States should he become indigent because Kangar's mother did not have the financial means to promise such support. On October 5, 2009, Kangar's mother signed Form I-864 as the petitioner for the immigrant visa for her unmarried, adult son, "Peter Kangar."

On October 23, 2009, the U.S. Department of State ("DOS") received "Peter Kangar's"

application for an immigrant visa, which included the defendant's Form DS-230, his mother and A.B.'s Form I-864s, and documentation in support of the DS-230, including Peter Kangar's Liberian National Police Record (dated August 10, 2009) and Peter Kangar's birth certificate. On January 28, 2010, the defendant appeared at the U.S. Embassy in Monrovia, Liberia posing as his brother, Peter Kangar, and met with a U.S. consular officer to attest to the information in his application.

On February 23, 2010, the defendant's mother submitted to a DNA test in Hyattsville, Maryland. On March 22, 2010, the defendant submitted to a DNA test at the U.S. Embassy in Monrovia, Liberia. The DNA testing confirmed that the defendant was the son of his mother.

Having successfully presented himself as "Peter Kangar," the defendant obtained an immigrant visa to the United States. On or about May 28, 2010, DOS issued the defendant an immigrant visa in the name of "Peter Kangar." On September 29, 2010, the defendant, using a Liberian passport in the name of "Peter Kangar," presented himself at a U.S. port of entry in New York, New York and gained admission as a lawful permanent resident from a Customs and Border Protection ("CBP") immigration inspector. After entering the U.S., the defendant was issued an alien registration card (commonly referred to as a "green card") in his brother's name. In June 2020, the defendant applied to renew his green card, and USCIS issued him a new card, expiring in November 2030.

After years of living in the United States under his brother's identity, the defendant attempted to gain U.S. citizenship. On July 14, 2017, the defendant submitted a handwritten Form N-400 (Application for Naturalization) to USCIS in the name of his brother, Peter Kangar. Among other statements, the defendant made the following false representations in his N-400 application: he denied using any other names since birth; his date of birth was in January 1981;

and he was single (never married).  He reported four children by name and date of birth, all of whom were born prior to his completion of the DS-230 immigrant visa application in 2009.  The defendant also denied giving any U.S. government officials information that was false, fraudulent, or misleading and denied ever lying to a U.S. government official to gain entry or admission to the United States.

On September 8, 2022, the defendant appeared in Philadelphia for his naturalization interview with a USCIS officer.  During this interview, which was audio and video-recorded, the defendant presented his green card, Pennsylvania Driver's License, and Liberian passport, all in the name of his younger brother, Peter Kangar, as proof of his identity.  Also during this interview, under penalty of perjury, the defendant falsely claimed to be Peter Kangar, falsely adopted Peter Kangar's biographical data, and falsely denied using any other names.  During the N-400 interview, the defendant also denied ever being married.  He explained that he has four children and mentioned that two of his sons were the product of his relationship with his girlfriend, Taslima.  When questioned about why he previously denied having any children on his immigrant visa application, the defendant claimed that he did not have "sufficient documentation" for his children at the time he completed the DS-230.  He admitted that he lived in South Africa from approximately 1997-2009, before returning to Liberia to complete requirements to obtain his U.S. visa, reportedly staying in Liberia for 11 months before traveling to the United States in 2010.  When questioned about why he failed to disclose having lived in South Africa for 12 years in his 2009 immigrant visa application, the defendant claimed he did not have South Africa residency documents at the time.  USCIS subsequently denied the defendant's N-400 application on the grounds that he had made misrepresentations about his children and history of residing in South Africa, noting discrepancies between his DS-230 and

N-400 applications.

While living in the United States under his brother's identity and defrauding the United States to obtain immigration benefits with that identity, the defendant often represented himself as his true identity of Isiah Kangar in his personal life. For example, on Facebook, although the defendant maintained a profile in the name of "Peter Kangar," he regularly communicated with friends and family using his true identity of Isiah, including responding to friends' messages in which they called him "Isiah," exchanging intimate messages with his wife Taslima Kangar, and discussing his use of Peter Kangar's name with his brother, the real Peter Kangar. The defendant also celebrated his birthday on Facebook on his birthday (May 13), rather than Peter Kangar's birthday (January 8). Similarly, evidence recovered from the defendant's cell phone pursuant to a federal search warrant shows that he regularly communicated with friends and family members via WhatsApp using his true name of Isiah.

The defendant also made several trips to South Africa to visit his wife, Taslima Kangar, and their children. During these trips, he traveled with his green card and Liberian passport, both in the name of his brother. On one occasion in October 2012, the defendant was interviewed by U.S. Homeland Security Investigations (his) agents upon reentering the United States. at Dulles International Airport after one of his trips to South Africa. At that time, he denied being married (despite wearing a wedding band) or having children in South Africa (despite having children's art and cards addressed to "Daddy" in his luggage). The defendant reported to agents that he had traveled to South Africa to visit Taslima Kangar, the wife of his brother Isiah. When questioned by agents about Isiah Kangar's whereabouts, the defendant claimed that Isiah was not in South Africa during his visit to Taslima.

During a search warrant executed on the defendant's residence at the time of his arrest on

February 15, 2024, HSI agents recovered documents in the name of Isiah Kangar. These included the defendant's South Africa divorce summons in the 2021 matter of Taslima Kangar v. Isiah Kangar, and South Africa child custody papers regarding the children of Isiah Kangar and Taslima Kangar, as well as several handwritten cards addressed to or from Isiah.

    **B.    Evidence of Kangar's Involvement in Charles Taylor's Forces and Exclusion from South Africa in 2006**

As discussed above, the government received the South Africa record in response to a MLAT request, including the defendant's 2006 application for asylum in South Africa in his true name of Isiah Kangar. In his application, the defendant indicated that (a) he was born in May 1973; (b) he was married; (c) he had three children; and (d) he had served as a member of Charles Taylor's government security forces in Liberia. The defendant also reported that he worked as a bodyguard for Charles Taylor and admitted to committing killings on behalf of Taylor's government. As a result of his role with Taylor's forces, the defendant claimed that he feared persecution or death if he returned to Liberia (now that Charles Taylor was no longer in power).

In or about November 2007, South Africa denied the defendant's application, and he was instructed to leave South Africa within 30 days. South Africa denied the defendant's application on the grounds that he "had not been able to establish a well founded fear of persecution in [his] home country," and under section 4(a) of the Refugee Act 130 of 1998, which prohibits those who are believed to have committed a crime against peace, a war crime , or a crime against humanity from obtaining refugee status.

As mentioned above, Charles Taylor was the leader of the NPFL, a rebel group that violently overthrew the government of Liberia and terrorized civilians. In August 1997, Charles Taylor was elected president of Liberia. Taylor's government was a kleptocracy buttressed by

7

state-sponsored violence. Taylor's Anti-Terrorist Unit and the Special Operations Division of the Liberian National Police were notorious for visiting atrocities upon Liberian citizens who opposed Taylor. Taylor resigned from the presidency in August 2003 at the peak of Liberia's second civil war, during which various rebel groups sought to remove Taylor from power.[2]

The government intends to introduce the South Africa record in its case-in-chief as evidence to prove the defendant's identity. Anticipating the defense may argue that portions of the South Africa record are inadmissible under Rule 404(b)(1), the government submits that the defendant's membership in Taylor's forces, which resulted in his exclusion from South Africa, provided his motive to commit the crimes charged in this Indictment, namely lying about his true identity and background to gain immigration benefits in the United States, and is thus admissible under Rule 404(b)(2).

## II. ARGUMENT

Evidence of the defendant's self-reported membership in Charles Taylor's forces and his exclusion from South Africa in 2006 due to his disclosure of this information in his asylum application is admissible under Rule 404(b) as probative of the defendant's motive to commit the crimes charged in this Indictment. In short, this evidence explains *why* the defendant assumed his younger brother's identity and misrepresented himself to obtain an immigrant visa to the United States.

Rule 404(b) provides that evidence of "a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but may be admitted to prove "motive, opportunity, intent,

---

[2] Taylor was indicted by the Special Court of Sierra Leone for war crimes committed during the conflict there and ultimately convicted of those crimes. He remains in custody serving his sentence in England.

8

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The list of proper purposes within the rule is non-exhaustive.

A. **The Evidence is Admissible under Rule 404(b)**

Rule 404(b) permits admission of evidence about a defendant's other uncharged bad acts when offered to illuminate some fact of consequence in the case, and forbids admission of evidence proffered only to prove the defendant's criminal propensity. *See Huddleston v. United States*, 485 U.S. 681, 686 (1988) (a proper purpose is one "probative of a material issue other than character"). The Third Circuit has consistently stated that it "favor[s]" the admission of evidence under Rule 404(b) if relevant for any purpose other than to prove propensity to commit the crime charged. *See, e.g.*, *United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999); *United States v. Long*, 574 F.2d 761, 766 (3d Cir. 1978). Along the same lines, for decades, the Court consistently stated that Rule 404(b) is a rule of "inclusion." *See, e.g.*, *Long*, 574 F.2d at 765; *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988) ("The drafters contemplated that Rule 404(b) would be construed as a rule of 'inclusion' rather than 'exclusion.'"); *United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992 ("404(b) is inclusive, not exclusive, and emphasizes admissibility."); *United States v. Jemal*, 26 F.3d 1267, 1272 (3d Cir. 1994) (recognizing "that Rule 404(b) is a rule of inclusion rather than of exclusion"); *United States v. Daraio*, 445 F.3d 253, 263 (3d Cir. 2006) ("In general, we favor the admission of Rule 404(b) evidence when it is relevant for any other purpose than to show the defendant's propensity to commit the charged offense."); *United States v. Lee*, 612 F.3d 170, 186 (3d Cir. 2012) (same); *United States v. DeMuro*, 677 F.3d 550, 563 (3d Cir. 2012) (same).[3]

---

[3] The decisions in *United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014), and *United States v. Brown*, 765 F.3d 278 (3d Cir. 2014), adopted a different tone. *See Caldwell*, 760 F.3d at 276 ("Rule 404(b) directs that evidence of prior bad acts be excluded—unless the proponent can

9

Courts in the Third Circuit follow the four-part test set forth in *Huddleston* to determine the admissibility of Rule 404(b) evidence. Specifically, courts require the following: (1) the evidence must have a proper purpose; (2) the evidence must be relevant; (3) the prejudicial impact must not substantially outweigh its probative value; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. *See Huddleston*, 485 U.S. at 691-92; *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003). The government submits that the proffered evidence regarding the defendant's self-reported involvement with Charles Taylor's forces and exclusion from South Africa satisfies all four prongs of the *Huddleston* test.

(i) <u>The evidence has a "proper purpose"</u>

The first step in the *Huddleston* test is to determine if the evidence is offered for a proper purpose. Specifically, "the proponent must identify a proper 404(b) purpose for admission (such as knowledge or intent) that is 'at issue' in, or relevant to, the case." *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014). Rule 404(b) itself enumerates several permissible purposes, providing that "[e]vidence of a crime, wrong, or other act . . . may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2).

---

demonstrate that the evidence is admissible for a non-propensity purpose."); *Brown*, 765 F.3d at 291 ("Rule 404(b) is generally a rule of exclusion."). But these decisions were ultimately reconciled with the Court's precedent. Namely, in *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017), the Third Circuit explained: "In sum, Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also 'inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted."

The defendant's self-reported involvement with Charles Taylor's government forces and exclusion from South Africa due to his disclosure of this information in his 2006 asylum application have a "proper" evidentiary purpose under Rule 404(b). The evidence demonstrates *why* the defendant later lied about his identity when seeking immigration benefits in the United States, and is therefore probative of his motive to commit the charged offenses.

Demonstrating the defendant's motive to commit the charged offenses is a proper purpose under Rule 404(b). *See, e.g., Langbord v. United States Dep't of Treasury*, 832 F.3d 170, 193 (3d Cir. 2016) (concluding other acts evidence provided a motive for defendant's actions and was therefore admissible under Rule 404(b)); *United States v. Sriyuth*, 98 F.3d 739, 747 (3d Cir. 1996) (evidence that defendant raped the victim was probative of his motive to commit the charged kidnapping, and motive is an issue in every criminal case); *United States v. Foster*, 891 F.3d 93, 107-10 (3d Cir. 2018) (in prosecution of defendants who possessed a weapon in a shopping center parking lot, evidence that men matching the same description were seen the day before in the same parking lot apparently "casing" a robbery was admissible under Rule 404(b) to prove their motive to possess a weapon); *United States v. Lee*, 612 F.3d 170, 188-89 (3d Cir. 2010) (defendant's statements about past possession of guns were relevant to establish motive to commit the offense).

      (ii)    <u>Evidence is Relevant to the Stated Purpose</u>

After determining whether the evidence is being offered for a proper purpose, the *Huddleston* framework requires the government demonstrate that the evidence is "relevant" to the stated purpose. Specifically, the government must establish how the proffered evidence "fits into a chain of inferences– a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference." *Caldwell*, 760 F.3d at 277 (internal quotation marks

and citation omitted). The Third Circuit has defined relevance as "a relationship between the evidence and a material fact at issue which must be demonstrated by reasonable inferences that make a material fact more probable or less probable than it would be without the evidence." *Sampson*, 980 F.2d at 888. Additionally, a district court conducting a Rule 404(b) analysis must give a detailed account of its findings at this juncture; it is not sufficient for the court to recite the purposes of Rule 404(b)(2). *Caldwell*, 760 F.3d at 277-78.

The evidence of the defendant's self-reported involvement in Charles Taylor's forces and his exclusion from South Africa due to his disclosure of this information in his 2006 asylum application is relevant and highly probative of the defendant's motive to commit the charged offenses. The fact that the defendant used his true name of Isiah Kangar, disclosed his involvement in Charles Taylor's forces in his South Africa asylum application, and was excluded from the country because of his disclosure, explains why he assumed his brother's identity and falsely represented himself to later obtain immigration benefits in the United States. He had a reason for committing the charged offenses--- had he used his true name and disclosed his background in his immigration visa application to the United States., his application would have likely been denied, just as it was in South Africa. Instead, he assumed his brother's identity to fraudulently obtain his sought-after immigration benefits.

### (iii) The Evidence is Not Overly Prejudicial

The third step in the *Huddleston* test is to determine whether the Rule 404(b) evidence's prejudicial impact substantially outweighs its probative value. Rule 403, which applies at this prong of the *Huddleston* analysis, makes clear that exclusion is allowed only if the prejudicial impact of the evidence "substantially outweighs" the probative value. *See* Fed. R. Evid. 403; *see also Huddleston*, 485 U.S. 691 (holding that the 403 balancing test applies under Rule 404(b)).

12

Rule 403 "creates a presumption of admissibility." *United States v. Claxton*, 766 F.3d 280, 302 (3d Cir. 2014). "Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value." *United States v. Repak*, 852 F.3d 230, 246 (3d Cir. 2017) (quoting *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002)).

Moreover, "'the prejudice against which [Rule 403] guards is *unfair* prejudice– prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found.'" *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (quoting *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (emphasis in original)). "Virtually all evidence is prejudicial or it is not material." *Carter*, 617 F.2d at 972 n.14 (quoting *Dollar v. Long Manufacturing Co.*, 561 F.2d 613, 618 (5th Cir. 1977)).

The proffered Rule 404(b) evidence does not threaten any "unfair prejudice," and certainly none that "substantially outweighs" that evidence's probative value. The evidence in question is not overly graphic or offensive, and it does not carry the risk of "cloud[ing] the jury's impartial scrutiny and reasoned evaluation of the facts." *Goodman*, 293 F.3d at 670. A "significant danger of undue prejudice" may exist where the jury would "harbor strong adverse sensitivity" to the evidence as a result of its inflammatory or emotional nature. *Id*. (internal quotation marks omitted); *see, e.g.*, *United States v. Cunningham*, 694 F.3d 372, 388-392 (3d Cir. 2012) (admission of multiple, "loathsome" child pornography videos found to be unduly prejudicial under Rule 403). The evidence here does not carry that risk: The government does not plan to introduce graphic testimony about any of the violent acts that the defendant may have

13

committed as a member of Taylor's forces. Nor does the government plan to introduce any kind of lengthy historical testimony regarding the war crimes and atrocities committed by Charles Taylor and his forces against the civilian population of Liberia. Instead, the government intends to introduce the defendant's self-reported statements in his South African asylum application and the records demonstrating that he was denied asylum as a result of these disclosures. These facts on their own are highly probative of the defendant's motive to commit the charged offenses, and the probative value of this evidence is not substantially outweighed by any risk of unfair prejudice to the defendant.

    (iv)  <u>Limiting Instruction</u>

  The final requirement of the test in *Huddleston* is that the Court give a limiting instruction, if the defendant requests it, which advises the jury that the evidence is admissible for a limited purpose and may not be considered in any other manner. *Caldwell*, 760 F.3d at 277. Even if the court includes such an instruction in its charge, the court should also provide the instruction at the time the evidence is admitted. *Id.* The government has no objection to this Court issuing such a proper instruction, if requested by the defense.

### III. **CONCLUSION**

For all of the foregoing reasons, the government respectfully requests that this Court enter an order admitting the evidence described.

                                                Respectfully Submitted,

                                                JACQUELINE C. ROMERO
                                                United States Attorney

                                                */s/ Kelly Harrell*
                                                KELLY HARRELL
                                                Assistant United States Attorney

                                                CHELSEA SCHINNOUR
                                                Trial Attorney
                                                U.S. Department of Justice
                                                Human Rights and Special Prosecutions Section

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Motion *in Limine* to Admit Evidence of Other Bad Acts Pursuant to Rule 404(b) has been served on defense counsel through the Electronic Case Filing (ECF) system and/or electronic mail:

>Jack McMahon, Esq.
>mcmahonlaw@hotmail.com

>*/s/ Kelly Harrell*
>KELLY HARRELL
>Assistant United States Attorney

Date: June 26, 2024